William McLaren, Administrator of Estate of William W. McLaren, Deceased, Appellant, v. F. Byrd, Incorporated et al., Defendants Below. F. Byrd, Incorporated, Appellee.

Gen. No. 39,933.

Opinion filed June 29, 1938.

DITCHBURNE & LOUNSBURY, of Chicago, for appellant; HARRY S. DITCHBURNE and NICHOLAS J. BOHLING, of Chicago, of counsel.

McKENNA & HARRIS, of Chicago, for appellee; JAMES J. McKENNA and BURRELL J. CRAMER, of Chicago, of counsel.

MR. JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

The plaintiff, William McLaren, as administrator of the estate of William W. McLaren, brings this appeal from a judgment entered in the circuit court on the verdict of a jury, finding the defendant F. Byrd Incorporated, not guilty, and assessing costs against plaintiff.

The suit was brought to recover alleged damages for injuries which resulted in the death of plaintiff's intestate and which was caused by the negligence of the defendant in permitting its truck with trailer attached to stand on an open highway in the nighttime without lights, flares or similar devices.

No question is raised as to the sufficiency of the pleadings.

Motions for a new trial and in arrest of judgment were overruled and judgment was entered against plaintiff as aforesaid.

Plaintiff's theory of the case is that the defendant is guilty of negligence as charged and that plaintiff's intestate was not guilty of contributory negligence; that the question of negligence on the part of the defendant and that of contributory negligence on the part of the plaintiff's intestate were properly subjects for impartial consideration by the jury; that the jury, however, was erroneously instructed as to the law in the case, at the request of the defendant, to the prejudice of the plaintiff, and that it is plaintiff's contention that such erroneous instructions, and each of them, constituted reversible error.

Defendant's theory is that plaintiff's intestate was guilty of contributory negligence and the defendant was not guilty of the negligence charged in the complaint.

Walter Howe, who was driving defendant's truck or tractor on the night of the accident, testified in substance, as follows: That at the time of the trial he was 29 years old and on September 16, 1935, he was em-

ployed by F. Byrd, Incorporated, of White Pigeon, Michigan, to drive a semitrailer and that prior to that time he had driven a "semi" for three years and had driven other similar trucks for six years; that at that time he was a licensed chauffeur, with a license issued by the State of Michigan; that the truck or tractor was a 1934 Ford and a semitrailer; that there was no bed in the cab; that the outfit had the regular lighting system hookup and the trailer lights were cut in on the taillight. They would all work off the same fuse and switch and there were headlights and marker lights on the cab, and all of the lights on the trailer. The marker lights on the cab were on the front over the cowl or over the top of the windshield. On the rear of the trailer were three green lights and there were two corner lights and the corner lights were red. Those lights were located underneath. On the rear of the truck on each corner were red reflectors. They were just plain reflectors, but they worked on a swinging hinge. Driving along they would swing and when a light hit them direct they would go on and off like a flasher. On the left hand there was another red light in addition to this reflector. In the middle of the rear of the truck were green lights. All of the lights operated on one switch which was located on top of the steering wheel. There was just one fuse. He testified that it was standard equipment, one fuse in connection with all the lights.

Howe further testifying stated that before starting out he looked over the equipment and found the lighting system all right and that he got a box of five fuses from the mechanic at the garage; that they were in a small box, about the size of an aspirin box and he shoved the box of fuses into his shirt pocket; [the fuses were short glass tubes with metal ends] that he started about 3:00 o'clock Sunday afternoon, first going to Elkhart, Indiana, and from there he took route

20 on in to Whiting, reaching there about 8:00 o'clock and stayed there until midnight; that his truck was parked in the lot of the gas station, about 40 feet from the highway; that he went to a restaurant and had some coffee and came back to the trailer, took the blanket and threw it on top of the tarpaulin and went to sleep for about three hours; that when he awoke it was about a quarter of 12:00 and he resumed his journey to Rockford; that it was a dark night and he turned on his lights and walked around the truck and that every one of the lights was burning and the reflectors were clean.

Howe further testifying stated that he was wide awake and drove on the route there until he reached 95th street, thence west on 95th street to Western avenue and north to 79th street and then west to Harlem avenue and 79th street and that by that time it must have been between 1:00 and 1:30 a. m.; that he went north on Harlem avenue, intending to get to a street north of Madison street; that where 79th street and Harlem avenue intersect it is a four-lane highway; that there is a bridge just south of 63rd street and that from that point it is a four-lane highway; that he proceeded north across the bridge, which is a viaduct over some railroad tracks; that after he got across the viaduct he was riding in the east lane, going north; that he stopped at 63rd street as there is a stop sign there; that he continued north and when he crossed 63rd street as he proceeded north, the front lights were functioning all right and he could see ahead; that he had a mirror extending out on to the left side of the cab so that he could see back.

Howe further testifying stated that it is between 90 to 100 miles from Chicago to Rockford from that point; that the traffic was light; that there were no street lights there at all; that he was not observing particularly the condition of the shoulder of the road on the

east side of Harlem avenue as he drove along; that when he reached 59th street all his lights went out, leaving him in complete darkness; that he was traveling at approximately 20 miles an hour at that time; that he glanced into the mirror and at the same time drove over to the side of the road as far as he could without taking chances of going off; that when he glanced in his rear view mirror he did not see any headlights back of him; that he put on the brakes to stop the outfit, but did not put on any emergency, but did put the brakes on suddenly and stopped within 40 feet; that there were no cars coming toward him from the front at any time and he could see no cars approaching from the rear through his rear view mirror; that after he came to a stop he opened the left door and "grabbed" a fuse out of his shirt pocket and started changing the fuse; that in changing the fuse he did not sit in the cab; that he put one foot on the concrete and one foot on the running board and then leaned over under the steering wheel, facing the dashboard; that the fuse had blown out on the right hand side of the steering post.

Howe further testifying stated that at that time he had three flares; that they were on the floorboard of the truck and that he had never changed a fuse before in that truck; that it does not take over 30 seconds to change a fuse; that in order to light and put out flares it would take a minute and a half and that he had the old fuse out and was just ready to put the new one in when he felt a crash in the back of the truck; that he was facing under the dashboard and did not see the car that hit him.

On cross-examination Howe testified that he did not know how long he was stopped before the impact took place, "but that it was less than 45 seconds, if more than 30 seconds."

The testimony on behalf of the defendant tended to show that while Howe was intent upon replacing the

fuse, the trailer was struck by a 1927 Chevrolet sedan automobile driven by Albert Wandland. In that car were William McLaren, plaintiff's intestate, who was 24 years of age and who was riding in the front seat at the right of the driver; that Clifford Hanley was riding at the right in the rear and Orvie Parker was riding at the left in the rear; that the occupants of the car who were sitting on the right side, McLaren and Hanley, were the most badly hurt; that Hanley died immediately and McLaren died two days later; that Parker was rendered unconscious and remained so until he was removed from the scene of the accident and that Wandland was not seriously hurt.

The testimony further shows that these four occupants of the Chevrolet had started out from 79th street and Kenwood avenue, Chicago, Wandland having agreed to take Hanley home to his residence in Oak Park; that they had traveled west on 79th street from Kenwood avenue and then went north on Harlem avenue; that the speed at which they traveled was not higher than 30 miles per hour; that the only two available witnesses for plaintiff, Wandland and Parker, both testified that at 63rd street and Harlem avenue where they stopped for a through street, no red lights or flares were in sight to the north as far as they could see, their range of vision being at least one mile; that the scene of the collision was four blocks ahead.

Wandland, the driver of the Chevrolet, testified that his headlights were good and that the reflectors in them were shiny and clean; that the lights on his car were so focused that the beams struck the road about 15 feet ahead of the car, and that he could see the pavement in the beam of the light 15 feet in front of him.

Wandland further testified that about the time they arrived at 59th street, still driving north, the shape of defendant's vehicle loomed up in the glare of the headlights; that he, Wandland, swerved trying to avoid it, but it caught the right side of the body of the Chev-

rolet; that he attempted to avoid it by swerving to the left; that the dark object in front of him was standing still; that there were no lights on it at the time he struck it and that there were no lights or flares of any kind around it.

Wandland further testifying stated that after striking the trailer, he stopped 10 or 20 feet in front of the truck; that the top of his automobile was ripped off and the top part of the body of the Chevrolet was taken off on the right side, but there was a little left on the left hand side, but that practically the whole top of the body was ripped off; that he was able to drive his car carrying Hanley and Parker to a doctor's office in Argo; that McLaren was taken to the same doctor's office by a passing motorist and later McLaren was moved from there to a hospital in Chicago.

Wandland further testifying stated that at the time of the collision the truck was standing upon the east lane of the highway, which was a four lane highway, and he was driving his Chevrolet in the same lane.

The evidence shows that the occurrence complained of happened between 1:00 and 2:00 o'clock a. m., daylight saving time on September 16, 1935; that the pavement was in good condition; that on September 15th there had been 100 per cent sunshine, the sun having set that day at 6:00 p. m., and on September 16th, the sun rose at 5:31 a. m.; that there was no precipitation either September 15th or September 16th; that the moon rose September 15, 1935, at 9:44 p. m. and set after daylight on September 16th; that the weather report showed that up to 1:00 a. m. on September 16th, there was intermittent moonlight and after 1:00 a. m. September 16th, there was bright moonlight; that these references are to standard time.

The evidence further shows that the moon was shining when the collision occurred, according to the testi-

mony of the driver of the truck, Walter Howe. He also said when his lights went out it was completely dark.

Wandland and Parker testified as to a slight mist being present which was also characterized by Wandland as being "a sort of dew falling."

The negligence charged against the defendant was:

(1)  General negligence in the operation and control of its motor vehicle;

(2)  Negligently and carelessly permitting its motor vehicle to remain standing upon the traveled portion of the highway without lights, flares or similar devices;

(3)  Violation of section 121b of "The Uniform Act Regulating Traffic on Highways" by permitting the vehicle to stand on the traveled portion of the highway without lighting equipment, flares, lanterns or other signals, contrary to the statute;

(4)  Breach of defendant's duty to remove the truck from the main traveled portion of the highway or to cause flares, lanterns or other signals to be lighted and placed upon the highway; in causing said truck to stand on the main traveled portion of the highway outside of the business or residence district, etc. between the hours of sunset and sunrise without lights, flares, lanterns or other signals whatsoever.

Referring again to the testimony of Walter Howe, on behalf of defendant, with regard to his conduct before the accident, he stated that when he came to a stop at the place indicated, after his lights went out, he opened the left door and took a fuse out of his shirt pocket and started to change the defective fuse; that at that time there were three flares on the floor board of the truck and that at the time of the collision he had one fuse in his hand, the dead one pulled out of the socket and was just ready to put the other one in; at that time he was facing under the dashboard. It is to

be noted that Howe did not attempt to comply with the statute regarding flares, etc.

Chapter 95½, par. 218, sec. 121, subd. (b), Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 85.250], reads as follows:

"(b) Whenever any motor vehicle of the second division and its lighting equipment are disabled during the period when lighted lamps must be displayed on vehicles and such motor vehicle cannot immediately be removed from the main traveled portion of a highway outside of a business or residence district, the driver or other person in charge of such vehicle shall cause such flares, lanterns or other signals to be lighted and placed upon the highway, one at a distance of approximately 100 feet in advance of such vehicle, one at a distance of approximately 100 feet to the rear of the vehicle, and the third upon the roadway side of the vehicle, except that if the vehicle is transporting flammables three red reflectors may be so placed in lieu of such other signals and no open burning flare shall be placed adjacent to any such last mentioned vehicle."

Howe further testified that he lighted his flares and set them out after the collision and that he did not save the defective fuse; that the blowing out of the fuse would not affect the operation of the car or disturb the rest of the ignition; that the flares on the floor of the car were the kerosene type and he also carried some matches and some fusees; that the fusees were carried against the front of the driver's seat on a rack; that they were like Roman candles, like the railroad men use.

Referring again to Wandland's testimony, he stated that just prior to the time his car struck the truck, his three companions were just holding the usual conversation; that they were talking about when they all worked together and they were talking about the service station; that nothing particular happened between 79th and 63rd streets; that just before the accident

everyone was wide awake and no one made any comments about his driving.

Plaintiff's witness Parker did not recall anything about striking the truck, due to the fact that he was thereby rendered unconscious. He testified that he had been looking ahead most of the time and did not observe what any of the other boys were doing; that there was no "foolery" going on in the automobile. He also testified to the casual conversation between "the three of us" and that McLaren was not asleep.

From the testimony of the police officers who visited the scene immediately after the collision, it appears that along the highway in that vicinity there was a curb or gutter not more than two inches higher than the highway; that 59th street did not continue east from Harlem avenue; that there was a dirt road going east which was quite a distance south from the sidewalk, and according to the sidewalk there would be quite a jog in the street if 59th street continued east; that the front end of the truck was approximately at the north sidewalk of 59th street and there was a shoulder upon which there had been scattered loose stone; that there was no curb between the north sidewalk and what would be the south sidewalk; that space was even with the highway and was filled in with stone. Inasmuch as the evidence was conflicting it was important that the jury be correctly instructed as to the law applicable thereto.

Criticism is made with reference to the instructions that were given on behalf of the defendant. About thirty-six instructions were given on both sides.

Instruction No. 4, given on behalf of defendant, reads as follows:

"The Court instructs you that if you believe from the evidence under these instructions of the Court that immediately prior to the accident in question Walter Howe was suddenly confronted with an emergency, and if you also believe from the evidence that said Walter

Howe before and at said time was acting with reasonable care and caution on his part, then you are instructed that under such state of proof, if you believe from the evidence it existed, said Walter Howe was not required to use the same degree of self-possession, coolness and judgment as when there was no emergency; and if under such circumstances, if you believe from the evidence they existed, said Walter Howe acted as an ordinarily prudent person would have acted under the same circumstances, then you should find the defendant not guilty.''

The difficulty with this instruction is that it selects out the name of a particular witness and speaks of him as being suddenly confronted with an emergency. There is no evidence in the record that Howe, the witness, was confronted with any emergency, but on the contrary he stated that he did not know anything about the accident until after it had happened. He claimed that at the time of the accident he was under the steering wheel in his truck, endeavoring to change a fuse which controlled the lights on said truck and that he knew nothing of the approaching automobile until after the collision. In addition to that the so-called emergency which would relax the rule, and thereby relieve a person from the use of the same degree of self-possession, coolness and judgment, must be such imminent peril and perilous position which would be caused by an agency beyond his control. *Chicago & E. I. R. Co. v. Storment,* 190 Ill. 42; *Bunch v. McAllister,* 266 Ill. App. 248. One cannot create an untoward situation or emergency by his own action and then by reason of such situation so created be relieved from such responsibility as the law requires of a person acting under normal conditions. The giving of such instruction was erroneous.

The court also erred in giving Instruction No. 7. That instruction reads as follows: ''The Court instructs you that the mere happening of the accident in

question, in and of itself, raises no presumption of negligence on the part of the defendant.''

In *Minnis v. Friend,* 360 Ill. 328, on page 337, the court in discussing a similar instruction given, stated:

'' 'No presumption that the defendant Arnold Friend was negligent arises from the fact that the accident happened.' Similar language to this was condemned in *West Chicago Street Railway Co. v. Petters,* 196 Ill. 298, where we held that instructions which select one item of evidence or one fact disclosed and state that a certain conclusion does not follow therefrom as a matter of law are calculated to confuse and mislead a jury. (*Drainage Commissioners v. Illinois Central Railroad Co.,* 158 Ill. 353.) If such instructions were to be held proper, a defendant could select each separate fact constituting the entire chain of evidence by which negligence was proved, and thus instructed the jury, through the court, that each link in the chain did not, standing alone, constitute negligence. While the separate links standing alone as 'mere facts' might not constitute negligence, the whole, taken together, would. Thus the consideration of these separate facts would be taken from the jury and its province would be invaded.'' This instruction was prejudicial and should not have been given.

Other points are raised as to other instructions given, and also as to rulings on the admission and refusal to strike out evidence, but inasmuch as this case must be retried, and the errors which were committed at the former trial may then be cured, we refrain from discussing them further at this time.

For the reasons herein given the judgment of the circuit court is reversed and the cause is remanded for a new trial.

*Judgment reversed and cause remanded.*

HEBEL, P. J., and HALL, J., concur.